# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THE MATTRESS FACTORY LTD. | : |
| Plaintiff, | : No.  20-1742 |
| v. | : |
| THE CINCINNATI INSURANCE COMPANY, | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

## <u>COMPLAINT</u>

Plaintiff The Mattress Factory LTD ("The Mattress Factory" or the "Museum") brings this action against Defendant The Cincinnati Insurance Company ("Cincinnati"), and in support, alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      The Mattress Factory, a non-profit contemporary art museum operating in Pittsburgh, Pennsylvania, purchased a property insurance policy from Cincinnati that protects the Museum against all business income and property damage losses unless those losses are specifically excluded from coverage (the "Cincinnati All-Risk Policy" or the "Policy," attached hereto as **Exhibit A**).

2.      Unlike many property insurance policies – including the property insurance policy The Mattress Factory purchased for the prior policy year – the Cincinnati All-Risk Policy **<u>does not</u>** exclude damages caused by a "virus" or "communicable disease" from the scope of covered loss.

3. In connection with the COVID-19 pandemic The Mattress Factory suffered catastrophic losses associated with the physical presence of, and physical loss or damage caused by, the virus and resulting orders of civil authorities issued in response to the physical presence of the virus and damage to, or loss of, property caused by the virus in the immediate vicinity of the Museum's covered premises. Those losses are covered by the plain text of the Cincinnati All-Risk Policy.

4. Yet when The Mattress Factory submitted a claim for coverage to Cincinnati, Cincinnati first misrepresented the terms of the Cincinnati All-Risk Policy, including misrepresenting the available limits and key Policy terms. After The Mattress Factory pointed out Cincinnati's misstatements, Cincinnati issued a wrongful, snap coverage denial of coverage in violation of Pennsylvania law and without conducting any investigation of the claim.

5. Accordingly, The Mattress Factory seeks a declaration of its rights under the Policy and breach of contract damages against Cincinnati for its failure to honor its coverage obligations, as well as damages for Cincinnati's breach of the implied covenant of good faith and fair dealing and for Cincinnati's statutory bad faith.

## THE PARTIES

6. Plaintiff The Mattress Factory is a nonprofit corporation, incorporated under the laws of the Commonwealth of Pennsylvania with its principal place of business at 500 Sampsonia Way, Pittsburgh, Pennsylvania 15212.

7. Defendant Cincinnati is incorporated under the laws of the State of Ohio with its principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014-5141.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(a)(1) and § 1332(c)(1), because the amount in controversy (exclusive of interest and costs) exceeds $75,000, and because there is complete diversity of citizenship of the parties.

9.     This Court has personal jurisdiction over Cincinnati, because it is registered to conduct business in the Commonwealth of Pennsylvania, regularly conducts business in the Commonwealth of Pennsylvania, and contracted with The Mattress Factory in Pennsylvania to insure property located in the Commonwealth of Pennsylvania.  Cincinnati's breach of the Policy it issued to The Mattress Factory is the subject of this dispute.

10.     Venue for this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## GENERAL ALLEGATIONS

### A.     The Mattress Factory

11.     The Mattress Factory is a contemporary art museum that has been operating in Pittsburgh's Central Northside neighborhood since 1977.

12.     The Mattress Factory is comprised of three separate buildings that are open to the public, as well as an Education Studio, Administrative Office, and a separate artists residence, all located in the Central Northside neighborhood.  Those buildings, which are all covered premises as defined under the Cincinnati All-Risk Policy, are located at: (a) 500 Sampsonia Way Pittsburgh, Pa 15212; (b) 1414 Monterey Street Pittsburgh, Pa 15212; (c) 503 N. Taylor Avenue Pittsburgh, Pa 15212; (d) 516 Sampsonia Way Pittsburgh, Pa 15212; and (e) 100 Jacksonia Street Pittsburgh, Pa 15212.

13.     The Museum has earned national and international recognition for its pioneering development of alternative art forms primarily through site-specific installations, as well as video and performance art, with the Museum's exhibitions being acclaimed by publications such as

The New York Times, Wall Street Journal, Art in America, among many others.

14. Among its many permanent installations are works by internationally renowned artists such as James Turrell, Yayoi Kusama, Bill Woodrow, and Greer Lankton.

15. In addition to hosting artists and exhibitions, The Mattress Factory Education Department has developed outreach and on-site programs using installation art to engage and motivate students and learners of all ages.

16. In 2003, the Museum opened a fully-equipped Education Studio for workshops, school programs, teacher training and community activities.

17. The Museum's Education Department serves more than 20,000 students, teachers, adults and families annually through a wide range of programs.

18. Approximately 58,000 individuals visited the Museum in 2019 alone.

19. The impact of the COVID-19 pandemic on The Mattress Factory has been dire.

20. Over 40 percent of The Mattress Factory's budget is derived from earned income, primarily in the form of ticket sales. As a result of mandatory closures due to the physical presence of the coronavirus in the immediate vicinity of The Mattress Factory, the Museum's revenues have plummeted to near $0, with The Mattress Factory suffering income losses and expenses in excess of $600,000 to date.

**B. The COVID-19 Global Pandemic**

21. Health authorities first identified COVID-19 in Wuhan, in the Hubei Province of China, and, in an unprecedented event that has not occurred in more than a century, a global pandemic ensued.

22. On January 30, 2020, during the term of the Cincinnati All-Risk Policy, the World Health Organization ("WHO") declared the COVID-19 outbreak a Public Health Emergency of International Concern.

- 4 -

23.     The next day, the United States Department of Health and Human Services declared that a public health emergency existed nationwide because of confirmed cases of COVID-19 in the United States.

24.     The rapid spread of COVID-19 is due in part to the highly transmissible character of the virus.  For example, as of March 1, 2020 there were 42,198 confirmed COVID-19 cases across the globe.  That number increased to 747,899 confirmed cases in April and 2,421,669 cases in May.[1]  As of November 2, 2020, there had been more than 9 million cases in the United States and more than 231,000 deaths.[2]  Worldwide there have been more than 46 million confirmed cases and over 1.2 million deaths.[3]

25.     According to the Center for Disease Control ("CDC"), "everyone is at risk for getting COVID-19."  A person may become infected by:  (1) coming into close contact (about 6 feet) with a person who has COVID-19;[4] (2) becoming exposed to respiratory droplets when an infected person talks, sneezes, or coughs; and/or (3) touching surfaces or objects that have the virus on them, and then touching his or her mouth, eyes, or nose.[5]

26.     In other words, one of the primary vectors for transmission of the virus is from person to property and property to person.

---

[1]     *See* https://graphics.reuters.com/CHINAHEALTHMAP/0100B59S39E/index.html.

[2]     *See* https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/.

[3]     *See* https://coronavirus.jhu.edu/map.html.

[4]     Recent studies indicate that the virus may even be transmitted when individuals are distanced more than six feet apart. *See* https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html.

[5]     https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

27.     Asymptomatic individuals may also transmit the virus.[6]  At least 44 percent of all infections occur from people without any symptoms.[7]  Thus even individuals who appear healthy and present no identifiable symptoms of the disease have and continue to spread the virus by breathing, speaking, or touching objects and surfaces.

28.     According to a report in The New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can produce as many viral droplets as one infectious cough."[8]

29.     In addition, one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[9]

30.     Although these virus-containing droplets are very small, they are physical objects and can travel and attach to other surfaces and cause or threaten to cause further infections, loss, or damage.

31.     Current evidence suggests that the COVID-19 virus may remain viable for hours to days on surfaces made from a variety of materials.[10]  The virus can survive and remain virulent on stainless steel and plastic for 3 to 6 days, on glass and banknotes for 3 days, and on wood and cloth for 24 hours.[11]  Testing of similar viruses suggests the COVID-19 virus can

---

[6]      *Id.*

[7]      https://www.nature.com/articles/s41591-020-0869-5.

[8]      https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.

[9]      https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/.

[10]     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

[11]     https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext.

survive on ceramics and silicon for at least 5 days.[12] Studies from the National Institutes of Health support the proposition that the virus may be detected in aerosols for up to three hours, on plastic and stainless steel for up to three days, and on cardboard for up to twenty-four hours.[13]

32. In addition, the CDC confirmed that the virus was identified on surfaces of the Diamond Princess Cruise ship a full 17 days after the cabins were vacated.[14]

33. Without a vaccine, effective control of the spread of COVID-19 relies on measures designed to reduce human-to-human, human-to-surface, and surface-to-human exposure.

34. As of November 2, 2020, Allegheny County has reported 15,796 positive tests for COVID-19 in Allegheny County and 434 resulting deaths. The City of Pittsburgh itself has had 4,316 positive tests and 109 deaths, including 42 positive tests in the Central Northside Neighborhood where The Mattress Factory is located and 231 positive tests and 5 deaths in the neighborhoods immediately adjacent to the Central Northside Neighborhood.[15]

35. Given the limitations on available testing and number of asymptomatic cases, these confirmed cases likely understate the extent of the presence of the virus in the immediate vicinity of The Mattress Factory's covered premises.

**C.      The Global, National, State, and Local Response**

36. The earliest confirmed deaths in the United States due to COVID-19 occurred in California in early and mid-February 2020.

---

[12]      https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4659470/.

[13]      https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days.

[14]      https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm.

[15]      The Allegheny County Health Department is tracking these cases here: https://www.alleghenycounty.us/Health-Department/Resources/COVID-19/COVID-19.aspx.

37.     Beginning in early March 2020, state and local governments issued orders suspending or severely curtailing the operations of all "non-essential" or "high risk" businesses in response to the virus, including museums such as The Mattress Factory, (the March 19, 2020 Order attached hereto as **Exhibit B** and the March 23, 2020 Order attached hereto as **Exhibit C**, collectively referred to as the Closure Orders").

38.     Other orders, to the same effect, directed citizens to stay at home except for certain limited activities.

39.     State and local governments issued the Closure Orders in response to the ubiquitous physical loss of or damage to property caused by COVID-19 in different states and localities, including the Commonwealth of Pennsylvania and Allegheny County, as well as property within close physical proximity to The Mattress Factory's covered premises.

40.     On March 6, 2020, the Governor of Pennsylvania declared a state of emergency in the Commonwealth of Pennsylvania in response to the physical presence of the COVID-19 virus.

41.     On March 19, 2020 the Governor of Pennsylvania and Pennsylvania Secretary of Health ordered the closure of all businesses that are not life sustaining in Allegheny County, Pennsylvania in response to the physical presence of the COVID-19 virus in Pennsylvania generally and Allegheny County in particular.  *See* **Exhibit B**.

42.     The Governor's Order was issued pursuant to his authority "to control ingress and egress to and from a disaster area."  *See* **Exhibit B**.  According to the Secretary of Health, the closure orders were necessary due to the physical presence of the virus in and around Allegheny County and the threat of further spread of the virus "by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes."  *See* **Exhibit C**.

43.     The Closure Orders recognize that the presence of COVID-19 in or on property

must be presumed given the ubiquitous and highly-contagious nature of COVID-19, and that without limiting or suspending the operations of non-essential businesses (such as museums), COVID-19 will continue to cause physical loss of or damage to property as well as threaten the health, life, and safety of patrons and employees.

44.     In other words, the physical presence of COVID-19 particles causes direct physical harm, direct physical damage, and/or direct physical loss to property.

45.     The presence of people infected with or carrying COVID-19 particles also results in direct physical loss to property.

46.     In upholding the legality of the Governor's Order, the Supreme Court of Pennsylvania concluded that the presence of the COVID-19 virus in the Commonwealth constituted a "natural disaster" defined as "[a]ny hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, landslide, mudslide, snowstorm, drought, fire, explosion or other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life."[16]

47.     The Court further held that "The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions.  Its presence in and movement through Pennsylvania triggered the Governor's authority under the Emergency Code."[17]

48.     In defining the area of the natural disaster, the Court noted that COVID-19 cases have been reported in Allegheny County and concluded that "any location (including Petitioner's businesses) where two or more people can congregate is within the disaster area."[18]

49.     These and similar Closure Orders, which prohibited access to The Mattress

---

[16]     *Friends of Devito v. Wolf*, 227 A.3d 872, 887 (Pa. 2020) (quoting 35 Pa.C.S. § 7102).
[17]     *Id.* at 889.
[18]     *Id.* at 889-90.

Factory, were issued as a result of direct damage to property caused by the presence of the COVID-19 virus in the immediate vicinity of The Mattress Factory (among other locations) and in response to the dangerous physical conditions resulting therefrom.[19]

50.     The Closure Orders and physical damage caused by the presence of the COVID-19 virus in the immediate vicinity of The Mattress Factory resulted in a loss of use of The Mattress Factory's property and caused an interruption of necessary operations and an immediate business income loss.  As a result, The Mattress Factory suffered substantial business income and related losses and expenses in excess of $600,000, which are covered under the Cincinnati All-Risk Policy.

**D.     The Cincinnati All-Risk Policy**

51.     Cincinnati issued the Cincinnati All-Risk Policy to The Mattress Factory for the policy period of July 28, 2019 through July 28, 2020.  *See* **Exhibit A**.

52.     The Mattress Factory purchased the Policy to protect against business interruption and related losses, such as those at issue in this case.

53.     Under the Policy, Cincinnati promised The Mattress Factory that it would:

   a.     "pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises'" provided that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and [t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is

---

[19]     *Id.* at 895.

taken to enable a civil authority to have unimpeded access to the damaged property";

b.    "pay for the actual loss of 'Business Income' you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a 'premises' shown in the Declarations due to direct 'loss' by a Covered Cause of Loss at a location contiguous to such 'premises'";

c.    "pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss";

d.    "pay for the actual loss of 'Business Income' and 'Rental Value' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'"; and

e.    "pay Extra Expense you sustain during the 'period of restoration.'"

54.    The Policy defines "Covered Causes of Loss as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."

55.    The Cincinnati All-Risk Policy is based on standardized policy forms issued by the Insurance Services Office. *See generally* **Exhibit A**.

56.    In 2006 the Insurance Services Office introduced a standard form Endorsement titled "Exclusion of Loss Due to Virus or Bacteria" that removes from the scope of coverage "loss or damage caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease."

57.    Many property insurance policies include "virus" or "communicable disease" exclusions barring coverage for loss or damage caused by any virus or disease.

58.    The insurance industry and Insurance Services Office developed these "virus" and

"communicable disease" exclusions in recognition of the fact that the presence of a virus can constitute physical loss or damage to which property insurance policies must respond.

59.     Importantly, while the Cincinnati All-Risk Policy uses other Insurance Services Office forms, Cincinnati **did not** include the Insurance Services Office "Exclusion of Loss Due to Virus or Bacteria" form in the Policy.  Nor does the Policy include any other exclusion purporting to exclude losses caused by viruses or communicable diseases.

60.     In contrast to the Cincinnati All-Risk Policy covering the 2019-20 policy term, the property policy The Mattress Factory purchased for the 2018-19 policy term does include a virus exclusion.

61.     Because Cincinnati did not include an exclusion in the Cincinnati All-Risk Policy that applied to losses caused by viruses, those losses necessarily fall within the scope of "Covered Causes of Loss" under the Cincinnati All-Risk Policy.

62.     The terms of the Cincinnati All-Risk Policy are more fully set forth in the Policy itself, attached as **Exhibit A**, and are incorporated herein by reference.

63.     All of The Mattress Factory's losses claimed herein fall within the scope of coverage of the Cincinnati All-Risk Policy, and are not otherwise excluded from coverage by any exclusions, conditions, or other limitations.

64.     The Mattress Factory paid all premiums owed under the Cincinnati All-Risk Policy and has complied with all conditions precedent to coverage.

65.     The Cincinnati All-Risk Policy was in full force and effect during the entire term of the Policy and was not canceled or otherwise terminated at any time by either party prior to the ending of the policy period.

**E.     Cincinnati's Bad Faith Claims Handling**

66.     The Mattress Factory gave timely notice of its covered losses to Cincinnati in a

letter dated April 7, 2020.  *See* **Exhibit D**.

67.     On April 9, 2020, Cincinnati issued a reservation of rights letter, request for information, and demand that The Mattress Factory produce test results regarding the presence of the virus.  *See* **Exhibit E**.

68.     The reservation of rights letter included a number of misstatements regarding the scope of available coverage.

69.     For example, on pages 4 and 6 of its letter, Cincinnati represented that a $25,000 sublimit applies to all Business Income, Extra Expense, and Civil Authority losses.  This representation was false.  In fact, Cincinnati removed that $25,000 sub-limit from its Policy in Form FA 258 05 16.

70.     Similarly, on pages 2 and 5 of Cincinnati's letter, Cincinnati stated that the Policy requires "direct physical loss or damage to Covered Property,"  but the phrase "direct physical loss or damage to Covered Property" does not appear anywhere in the Cincinnati All-Risk Policy.

71.     Cincinnati also represented that "Direct physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect."  The Policy includes no such requirement.  Indeed, the words "physical effect," "permanent change," "physical appearance," and "manifestation" do not appear anywhere in the Cincinnati All-Risk Policy.

72.     Cincinnati's representation regarding the need for a "deformation, permanent change in physical appearance or other manifestation of a physical effect" is also contrary to relevant and controlling authority.  *See*, *e.g.*, *Motorists Mutual Insurance Co. v. Hardinger*, 131 F. App'x 823, 827 (3d Cir. 2005) (decided under Pennsylvania law and holding e coli bacteria in

a home could constitute physical loss or damage and reversing the trial court's contrary ruling).

73.     On April 14, 2020, The Mattress Factory responded to Cincinnati's letter by requesting that Cincinnati withdraw its reservations based on the foregoing misrepresentations. *See* **Exhibit F**.

74.     The Mattress Factory also responded to Cincinnati's requests for information by providing detailed information regarding the actual presence of the virus in and around The Mattress Factory and the Closure Orders impacting The Mattress Factory's income and operations.

75.     In response to Cincinnati's demand for testing, The Mattress Factory pointed out that the dearth of testing equipment made Cincinnati's demand for testing impracticable, particularly given the fact that: (a) The Mattress Factory is a non-profit arts organization that does not have the requisite expertise or funding to conduct testing to reveal the presence of a novel virus; (b) the Closure Orders prohibited The Mattress Factory from conducting testing at third-party locations (the presence of the virus at third-party locations triggers the Policy's "civil authority" coverage); (c) nothing in the Policy itself required The Mattress Factory to conduct testing; and (d) the Closure Orders themselves coupled with publicly available testing data revealing positive COVID-19 cases and deaths in the immediate vicinity of The Mattress Factory confirmed the presence of the virus.

76.     Nevertheless, in an effort to cooperate in good faith with its insurer, The Mattress Factory requested that Cincinnati provide The Mattress Factory with reference to resources necessary to enable The Mattress Factory to conduct any testing.

77.     In response, on April 27, 2020, Cincinnati wrongfully denied coverage for The Mattress Factory's claim in its entirety.  *See* **Exhibit G**.

78. Cincinnati's denial of coverage was contrary to the plain terms of the Cincinnati All-Risk Policy and clearly established Pennsylvania law, of which Cincinnati was aware at the time it issued its coverage denial.

79. Prior to issuing the reservation of rights letter, Cincinnati did not conduct any investigation of The Mattress Factory's claim whatsoever.

80. This lawsuit followed.

## COUNT ONE:  DECLARATORY JUDGMENT

81. The Mattress Factory repeats and re-alleges each of the allegations contained in the above-stated paragraphs as if the same were set forth below.

82. The Mattress Factory seeks a declaration, pursuant to 28 U.S.C. § 2201, that Cincinnati is obligated, in accordance with the terms of the Cincinnati All-Risk Policy to provide insurance coverage for The Mattress Factory's business income losses and related costs and expenses including, but not limited to, those business income and extra expense costs covered under the Policy's Civil Authority coverage.

83. An actual and justiciable controversy exists between the parties with respect to this issue due to Cincinnati's denial of its obligations under the Cincinnati All-Risk Policy.

84. This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

85. The Mattress Factory is entitled to have the Cincinnati All-Risk Policy interpreted in a reasonable manner that maximizes its insurance coverage.

86. The Mattress Factory is entitled to a declaration from this Court that the losses complained of herein are covered under the Cincinnati All-Risk Policy.

## COUNT TWO:  BREACH OF CONTRACT

87.     The Mattress Factory repeats and re-alleges each of the allegations contained in the above-stated paragraphs as if the same were set forth below.

88.     The Cincinnati All-Risk Policy is a valid, enforceable contract between The Mattress Factory and Cincinnati.

89.     The Mattress Factory has performed all obligations under the Policy, and any and all conditions precedent to coverage have been satisfied or waived.

90.     In return for the premium amounts The Mattress Factory paid, Cincinnati agreed to assume the risk of all losses covered under the Cincinnati All-Risk Policy.

91.     The Mattress Factory's losses complained of herein are the result of Covered Causes of Loss within the meaning of the Cincinnati All-Risk Policy that entitle The Mattress Factory to be reimbursed for those losses.

92.     No exclusions, conditions, or other limitations in the Policy excuse Cincinnati's obligation to provide coverage to The Mattress Factory.  Because exclusions, conditions, and other limitations on coverage must be pled by Cincinnati as an affirmative defense, and Cincinnati has the burden of proving their applicability, The Mattress Factory reserves all rights to respond to any such defenses once they are asserted.

93.     Cincinnati breached its obligations under the Cincinnati All-Risk Policy by: (a) failing to conduct a good faith investigation of the claim; and (b) wrongfully denying coverage for The Mattress Factory's claim.

94.     In addition, implied in every insurance policy is a covenant that the insurance company will act in good faith and deal fairly with its insured, that the insurance company will not interfere with the right to receive benefits under the policy, that the insurance company will

give at least as much consideration to the interests of the insured as it does to its own interests, that the insurance company will exercise diligence, good faith, and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured, and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage (hereinafter referred to as the "implied covenant of good faith and fair dealing").

95.     Cincinnati, in violation of the implied covenant of good faith and fair dealing, has refused to acknowledge the coverage provided under the Policy by refusing to pay valid claims for reasons that are unsubstantiated under the terms and condition of the Policy.  Cincinnati has done so for the purpose of consciously withholding policy benefits and placing its own interests above those of its insured for the purpose of utilizing money which should have been paid under the terms and conditions of the Policy.  This violation of the implied covenant of good faith and fair dealing constitutes an independent breach of contract.

96.     As a direct and proximate result of Cincinnati's breach of contract and breach of the implied covenant of good faith and fair dealing, The Mattress Factory has been wrongfully deprived of the benefits of insurance coverage, for which The Mattress Factory paid substantial premiums, resulting in several hundred thousand dollars in losses.

97.     As a direct and proximate result of Cincinnati's breach of contract, The Mattress Factory has also incurred additional consequential damages, including without limitation, attorneys' fees and other expenses in bringing this action, which damages are not subject to the Cincinnati All-Risk Policy's limits of liability.

## COUNT THREE:  BAD FAITH

98.     The Mattress Factory repeats and re-alleges each of the allegations contained in the above-stated paragraphs as if the same were set forth below.

99.     By statute, 42 Pa.C.S. § 8371, Pennsylvania prohibits insurers from placing their

own interests ahead of their own policyholders and provides bad faith remedies for "an action arising under an insurance policy.

100.    Cincinnati has a statutory obligation to act in good faith toward The Mattress Factory in responding to and investigating claims.

101.    As set forth above, Cincinnati has repeatedly placed its own interests ahead of The Mattress Factory's interests, as well as the interests of other policyholders nationwide and across the Commonwealth, to the detriment of The Mattress Factory.

102.    Cincinnati's conduct described above, and as set forth below, constitutes bad faith prohibited by 42 Pa.C.S. § 8371.

103.    Moreover, Cincinnati has repeatedly violated and continues to violate the Pennsylvania Unfair Insurance Practices Act, 40 P.S. § 1171.1, *et seq.* While there is no private cause of action for such violations, and no such private cause of action is asserted here, those violations are further evidence of Cincinnati's bad faith.

104.    Cincinnati has acted in bad faith toward The Mattress Factory with respect to this claim by, among other things: (a) misrepresenting the terms, conditions, and available limits under the Cincinnati All-Risk Policy; (b) issuing a snap coverage denial when the policyholder identified those misrepresentations; (c) denying coverage without conducting an investigation or adjusting the claim; (d) acting in a one-sided manner and exposing The Mattress Factory to severe losses; and (e) refusing to pay claims without legal compulsion, forcing The Mattress Factory, a vulnerable non-profit organization, to protect its rights by way of this lawsuit against Cincinnati.

105.    On information and belief, Cincinnati has engaged in a pattern or practice of denying all claims related to the COVID-19 pandemic under its standard form all-risk property

insurance policies without conducting good faith investigations of its policyholders' claims or considering the unique facts and circumstances of each of those claims.

106.    On information and belief, there are currently dozens of lawsuits against Cincinnati alleging similar wrongful, bad faith conduct with respect to the handling of such claims.

107.    On information and belief, Cincinnati's widespread, wrongful, bad faith business practices have resulted in significant damages to policyholders in Pennsylvania and around the country, requiring them to incur the costs of filing suit to obtain the insurance coverage to which they are entitled.

## PRAYER FOR RELIEF

**WHEREFORE**, The Mattress Factory respectfully prays that this Court:

1.    Declare that Cincinnati is obligated to pay The Mattress Factory benefits owed under the Cincinnati All-Risk Policy;

2.    Award The Mattress Factory compensatory, direct and consequential damages in the amount established by the evidence, which is in excess of $75,000;

3.    Award The Mattress Factory damages sustained as a result of Cincinnati's unfair and unreasonable breach of the statutory duty of good faith and fair dealing including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs and exemplary damages in an amount allowable by law;

4.    Award The Mattress Factory pre-judgment interest and post-judgment interest;

5.    Award The Mattress Factory its costs and fees incurred in this action; and

6.    Award The Mattress Factory any other relief the Court deems just and proper.

## JURY DEMAND

The Mattress Factory demands a trial by jury for any and all issues so triable.

DATED this 12th day of November, 2020.

By: _s/Dominic I. Rupprecht_
Dominic I. Rupprecht, Esq.
Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Phone: 412.288.3367
Email: drupprecht@reedsmith.com

*Attorney for Plaintiff The Mattress Factory LTD*

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a true and correct copy of the foregoing: **COMPLAINT** by the method indicated:

____x____       U. S. Mail (Certified, Mail-Return Receipt Requested)

_____       CM/ECF Electronic Filing System

_____       Facsimile Transmission

and addressed to the following:

The Cincinnati Insurance Company
c/o Steve Corbly, Registered Agent
P.O. Box 145496
Cincinnati, Ohio 45250-5496

DATED this 12th day of November 2020.


_s/Dominic I. Rupprecht_____
Counsel for The Mattress Factory